IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TRICIA IRENE MCGINNESS,

Plaintiff,

v.

LELAND DUDEK
*Acting Commissioner of Social Security*,

Defendant.

25cv00492
ELECTRONICALLY FILED

**MEMORANDUM OPINION**

Before the Court is Plaintiff's Motion for Summary Judgment in this Social Security matter. ECF 11.  Plaintiff, who was denied social security disability benefits, presents two issues on appeal to this Court: (1) whether the ALJ failed to properly evaluate the opinions of Plaintiff's treating providers; and (2) whether the ALJ failed to properly evaluate Plaintiff's subjective complaints. ECF 12.

Defendant timely filed a response in opposition to Plaintiff's motion. ECF 18. In his brief, Defendant counters that substantial evidence of record: (1) supports the ALJ's finding that Plaintiff's residual functioning capacity ("RFC") demonstrated that Plaintiff could perform work which exists in significant numbers in the economy; and (2) supports the ALJ's evaluation of Plaintiff's subjective complaints. ECF 18.

**I. BACKGROUND**

Plaintiff worked as a server and bartender prior to December 14, 2015.  Plaintiff's disability purportedly began on December 14, 2015, due to left breast cancer, obesity,

1

depression, and anxiety disorder. ECF 4-2, p. 25.  The ALJ found these to be medically determinable impairments which significantly limited Plaintiff's ability to perform basic work activities. Id. However, the ALJ also found that through the date of last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. ECF 4-2, p. 26. Specifically, the ALJ noted that after considering Plaintiff's physical impairment under 13.10, Plaintiff's medical record "did not document locally advanced cancer, recurrent carcinoma, small-cell carcinoma, secondary lymphedema, or carcinoma with metastases to the supraclavicular or infraclavicular nodes, 10 or more auxiliary nodes, or distant metastases." Id. As for Plaintiff's obesity impairment, the ALJ noted that under all pertinent listings, the medical evidence did not "document the level of severity required to meet any listing, and no medical source opine[d] that the claimant's condition [was] equivalent in severity to the criteria of any listed impairment." Id. The ALJ also considered Plaintiff's mental impairment and found that when considered "singly or in combination, they did not meet or medically equal the criteria of listings 12.04 and 12.06." Id.

Declining to review the ALJ's decision on this matter, the Appeals Council determined that there was no evidence that:

(1) the Administrative Law Judge abused her discretion;

(2) there was an error of law;

(3) the decision was not supported by substantial evidence;

(4) there is a broad policy or procedural issue that may affect the public interest;

2

(5) it had received additional new, material evidence that relates to the period on or before the date of the hearing decision.

Plaintiff timely filed the instant civil action, and this Court will now review the matter *de novo.*

## II. STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[1] and 1383(c)(3)[2]. Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding Disability Insurance Benefits, or "DIB"), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding Supplemental Security Income, or "SSI"), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are

---

[1] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business. . .

42 U.S.C. § 405(g).

[2] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

3

pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a), and vice versa. *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n.1 (3d Cir. 2002).

**A.** *Substantial Evidence*

If supported by substantial evidence, the Commissioner's factual findings must be accepted as conclusive. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995); *Wallace v. Secretary of HHS,* 722 F.2d 1150, 1152 (3d Cir. 1983). The district court's function is to determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings. *See Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Supreme Court has explained that "substantial evidence" means "more than a mere scintilla" of evidence, but rather, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson,* 402 U.S. at 401 (citation omitted). *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005); *Ventura*, 55 F.3d at 901 (*quoting Richardson*); *Stunkard v. Secretary of HHS*, 841 F.2d 57, 59 (3d Cir. 1988).

The Court of Appeals for the Third Circuit has referred to this standard as "less than a preponderance of the evidence but more than a mere scintilla." *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002) (quoting *Jesurum v. Secretary of the Dep't of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). "A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala,* 994 F.2d 1058, 1064 (3d Cir. 1993) (quotin*g Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). The substantial evidence standard allows a court to review a decision of an

ALJ, yet avoid interference with the administrative responsibilities of the Commissioner. *See Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir.1983).

In reviewing the record for substantial evidence, the district court does not weigh the evidence or substitute its own conclusions for those of the fact finder. *Rutheford*, 399 F.3d at 552. In making this determination, the district court considers and reviews only those findings upon which the ALJ based his or her decision, and cannot rectify errors, omissions or gaps in the medical record by supplying additional findings from its own independent analysis of portions of the record which were not mentioned or discussed by the ALJ. *Fargnoli v. Massarini,* 247 F.3d 34, 44 n.7 (3d Cir. 2001) ("The District Court, apparently recognizing the ALJ's failure to consider all of the relevant and probative evidence, attempted to rectify this error by relying on medical records found in its own independent analysis, and which were not mentioned by the ALJ. This runs counter to the teaching of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.' *Id.* at 87.") (parallel and other citations omitted).

An ALJ must do more than simply state factual conclusions, but instead must make specific findings of fact to support his or her ultimate findings. *Stewart v. Sec'y HEW*, 714 F.2d 287, 290 (3d Cir. 1983).

**B.** *Five Step Determination Process*

In order to qualify for DIB or SSI benefits, the claimant must show "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

5

expected to last for a continuous period of not less than twelve months." 42 U.S.C.

§ 1383c(a)(3)(A).

When resolving the issue of whether a claimant is disabled and entitled to either DIB or

SSI benefits, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520

and 416.920 (1995).  *See Sullivan*, 493 U.S. at 525.  The Court of Appeals for the Third Circuit

summarized this five-step process in *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999):

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 1520(a). If a claimant is found to be engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert*, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.
>
> In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.1994).
>
> If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. See 20 C.F.R. § 404.1523. The ALJ will often seek the assistance of a vocational expert at this fifth step. *See, Podedworny v. Harris,* 745 F.2d 210, 218 (3d Cir.1984).

*Plummer*, 186 F.3d at 428.  *See also Rutherford*, 399 F.3d at 551 (explaining: "In the first four

steps the burden is on the claimant to show that she (1) is not currently engaged in gainful

employment because she (2) is suffering from a severe impairment (3) that is listed in an appendix (or is equivalent to such a listed condition) or (4) that leaves her lacking the RFC to return to her previous employment (Reg. §§ 920(a) to (e)). If the claimant satisfies step 3, she is considered *per se* disabled. If the claimant instead satisfies step 4, the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform (Reg. § 920(f)).").

> Further:

> When "mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 202 (3d Cir. 2019). The regulations set forth a "special technique" used for evaluating mental impairments. *See* 20 C.F. R. §§ 404.1520a, 416.920a. As part of that "special technique," a claimant's degree of functional limitation is rated in four broad functional areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. *Id*. at § 404.1520a(c)(3), 416.920a(c)(3). A claimant's degree of limitation in these functional areas is rated using "the following five-point scale: None, mild, moderate, marked, and extreme." *Id*. at §§ 404.1520a(c)(4), 416.920a(c)(4). The ratings in these four broad functional areas are used at step 2 to determine if the claimant has a severe mental impairment, and if the claimant has a severe mental impairment, the ratings are also used at step 3 to determine if the claimant's severe mental impairment meets or equals a listed mental disorder. *Id*. at §§ 404.1520a(d), 416.920a(d).

*Walizer v. Dudek*, Civ. No. 24-25, 2025 WL 964259, at *4 (M.D. Pa. Mar. 31, 2025).

Thus, a claimant may demonstrate that his or her impairment is of sufficient severity to qualify for benefits in one of two ways: (1) by introducing medical evidence that the claimant is disabled *per se* because he or she meets the criteria for one or more of a number of serious Listed Impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, or that the impairment is *equivalent* to a Listed Impairment; or (2) in the event that claimant suffers from a less severe impairment, he or she will be deemed disabled where he or she is nevertheless unable

to engage in "any other kind of substantial gainful work which exists in the national economy

. . . ." *Heckler v. Campbell*, 461 U.S. 458, 460-461 (1983) (*citing* 42 U.S.C. § 423 (d)(2)(A));

*Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777 (Steps 1-3)). In order to prove disability

under this second method, plaintiff must first demonstrate the existence of a medically

determinable disability that precludes him or her from returning to his or her former job (Steps

1-2, 4). *Stunkard,* 841 F.2d  at 59; *Kangas*, 823 F.2d at 777. Then, the claimant having shown

that he or she is unable to resume his or her previous employment, the burden shifts to the

Commissioner (Step 5) to prove that, given plaintiff's mental and/or physical limitations, age,

education and work experience, he or she is able to perform substantial gainful activity in jobs

available in the national economy. *Campbell*, 461 U.S. at 461; *Boone v. Barnhart*, 353 F.3d 203,

205 (3d Cir. 2003); *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777.

Moreover, the Commissioner/ALJ;

> must "explicitly" weigh all relevant, probative and available evidence. . . . [and]
> must provide some explanation for a rejection of probative evidence which
> would suggest a contrary disposition. . . . The [Commissioner] may properly
> accept some parts of the medical evidence and reject other parts, but she must
> *consider* all the evidence and *give some reason for discounting* the evidence she
> rejects.

8

*Adorno*, 40 F.3d at 48 (emphasis added; citations omitted). *See also Fargnoli,* 247 F.3d at 42-43 (although ALJ may weigh conflicting medical and other evidence, he must give some indication of the evidence he rejects and explain the reasons for discounting the evidence; where ALJ failed to mention significant contradictory evidence or findings, Court was left to wonder whether he considered and rejected them, or failed to consider them at all, giving Court "little choice but to remand for a comprehensive analysis of the evidence consistent with the requirements of the applicable regulations and the law of this circuit. . . ."); *Burnett*, 220 F.3d at 121 ("In making a residual functional capacity determination, the ALJ must consider all evidence before him. . . . Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. . . . 'In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.' *Cotter*, 642 F.2d at 705.") (additional citations omitted).

### C. *Multiple Impairments*

Where a claimant has multiple impairments which, individually, may not reach the level of severity necessary to qualify as a Listed Impairment, the ALJ/Commissioner nevertheless must consider all of the claimant's impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Burnett*, 220 F.3d at 122 ("the ALJ must consider the combined effect of multiple impairments, regardless of their severity"); *Bailey v. Sullivan*, 885 F.2d 52 (3d Cir. 1989) ("in determining an individual's eligibility for benefits, the 'Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity'") (*citing* 42 U.S.C. § 423(d)(2)(C), and 20 C.F.R. §§ 404.1523, 416.923).

Section 404.1523 of the Regulations, titled "Multiple impairments," provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (*see* § 404.1520).

20 C.F.R. § 404.1523.

Even if a claimant's impairment does not meet the criteria specified in the listings, he must be found disabled if his condition is *equivalent* to a listed impairment. 20 C.F.R. § 404.1520(d).  When a claimant presents more than one impairment, "the combined effect of the impairment must be considered before the Secretary denies the payment of disability benefits." *Bittel v. Richardson*, 441 F.2d 1193, 1195 (3d Cir.1971) (citation omitted).  To that end, the ALJ may not just make conclusory statements that the impairments do not equal a listed impairment in combination or alone, but rather, is required to set forth the reasons for his or her decision, and *specifically* explain why he or she found a claimant's impairments did not, alone or in combination, equal in severity one of the listed impairments. *Fargnoli,* 247 F.3d at 40 n. 4 (citing *Burnett*, 220 F.3d at 119-20).

If the ALJ or Commissioner believes the medical evidence is inconclusive or unclear as to whether the claimant is unable to return to past employment or perform substantial gainful activities, it is incumbent upon the ALJ to "secure whatever evidence [he/she] believed was needed to make a sound determination." *Ferguson*, 765 F.2d at 36.

**D.** *Claimant's Subjective Complaints of Impairments and Pain*

As explained by the court in *Schneider v. Berryhill*, Civ. No. 17-1299, 2019 WL 698471, (W.D. Pa. Feb. 20, 2019):

> SSR 16-3p went into effect on March 28, 2016. SSR 16-3p supersedes SSR 96-7p, the previous rule governing the evaluation of subjective symptoms. *See,* SSR 16-

10

3p, 2016 WL 1119029 (March 16, 2016). SSR 16-3p removes the term "credibility," clarifying that the subjective symptom evaluation is not an examination of an individual's character but rather an ALJ is to "consider all of the evidence in an individual's record . . . to determine how symptoms limit ability to perform work-related activities." *Id*. at *2. In so doing, an ALJ is to use a two-step process. *Id*. at *2-33. Thus, after an ALJ finds "that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms", the ALJ shall then consider all of the evidence in the record when he/she evaluates the intensity and persistence of symptoms to determine how "symptoms limit [the] ability to perform work-related activities." *Id*. In this regard, and to the extent relevant and available, the ALJ should consider objective medical evidence; individual statements; other medical sources; non-medical sources; the factors set forth in 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3) including daily activities; the location, duration, frequency and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; treatment other than medication an individual receives or has received for relief of pain or other symptoms; any measures other than treatment used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id.* at *4-7.

*Schneider*, 2019 WL 698471, at *2. *See also Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir.1993) (determining: "An ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence.").

## III. STATEMENT OF THE FACTS

Plaintiff applied for Supplemental Security Income alleging her disability began on December 14, 2015, due to breast cancer, osteopenia, Stage 4 one cancer and Stage 4 lung cancer. Her claim was initially denied on September 26, 2023, and was again denied on February 2, 2024. She was next represented by counsel during her June 11, 2024 hearing before an Administrative Law Judge ("ALJ"). On October 15, 2024, the ALJ issued an unfavorable opinion, of which the portions relevant to the Court's review are as follows:

11

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

After careful consideration of the entire record, the undersigned makes the following findings:

**1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2019.**

**2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 14, 2015 through her date last insured of June 30, 2019 (20 CFR 404.1571 et seq.).**

The claimant testified that she worked as a server and bartender during the relevant period, but there are no reported earnings that rise to the level of substantial gainful activity (Exhibit 7D).

**3. Through the date last insured, the claimant had the following severe impairments: left breast cancer, obesity, depression, and anxiety disorder (20 CFR 404.1520(c)). The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.**

**4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

The undersigned considered the claimant's physical impairment under listing 13.10. However, through the date last insured, the objective medical evidence does not document locally advanced cancer, recurrent carcinoma, small-cell carcinoma, secondary lymphedema, or carcinoma with metastases to the supraclavicular or infraclavicular nodes, 10 or more auxiliary nodes, or distant metastases. The undersigned also assessed the claimant's obesity under all pertinent listings, but the medical evidence does not document the level of severity required to meet any listing, and no medical source opines that the claimant's condition is equivalent in severity to the criteria of any listed impairment.

The severity of the claimant's mental impairments, considered singly and in combination, did not meet or medically equal the criteria of listings 12.04 and 12.06. In making this finding, the undersigned has considered whether the "paragraph B" criteria were satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to

12

function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant had a mild limitation. She reported that she cared for her personal needs, drove a vehicle, left her residence without accompaniment, worked part-time as a bartender and server, and performed household tasks such as painting, cleaning, shopping, and preparing meals (Exhibits 2F and 5F; and Testimony). Mental status examinations describe a pleasant, cooperative, alert, and fully oriented presentation without abnormalities in mood, affect, appearance, speech, motor activity, eye contact, manner of relating, insight, judgment, reasoning, perception, attention, concentration, memory, cognitive functioning, or thought processes from the alleged onset date through the date last insured. No treating, examining, or reviewing medical source opined that she had greater limitation in this domain.

In interacting with others, the claimant had a moderate limitation. She reported that she lived with family, visited and socialized with other family members, left her residence without accompaniment, and travelled to public locations such as grocery stores (Id.). The claimant did not allege limitations in interacting or getting along with others at the hearing. Mental status examinations describe a pleasant, cooperative, alert, and fully oriented presentation without abnormalities in mood, affect, appearance, speech, motor activity, eye contact, manner of relating, insight, judgment, reasoning, perception, attention, concentration, memory, cognitive functioning, or thought processes from the alleged onset date through the date last insured. No treating, examining, or reviewing medical source opined that she had greater limitation in this domain.

With regard to concentrating, persisting or maintaining pace, the claimant had a moderate limitation. As discussed above, she cared for her personal needs, drove a vehicle, left her residence without accompaniment, worked part-time as a bartender and server, and performed household tasks such as painting, cleaning, shopping, and preparing meals. Mental status examinations describe a pleasant, cooperative, alert, and fully oriented presentation without abnormalities in mood, affect, appearance, speech, motor activity, eye contact, manner of relating, insight, judgment, reasoning, perception, attention, concentration, memory, cognitive functioning, or thought processes from the alleged onset date through the date last insured. No treating, examining, or reviewing medical source opined that she had greater limitation in this domain.

As for adapting or managing oneself, the claimant had experienced a mild limitation. She cared for her personal needs and helped maintain her residence. She did not require psychiatric hospitalization or seek treatment with a psychiatrist, psychologist, or counselor during the period at issue. There is no evidence of self-injurious behavior or an inability to set realistic goals, make plans independent of others, travel to unfamiliar places, or avoid normal hazards.

No treating, examining, or reviewing medical source opined that she had greater limitation in this domain.

Because the claimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied.

The undersigned has also considered whether the "paragraph C" criteria were satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The medical evidence does not establish repeated episodes of decompensation, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate, an inability to function outside a highly supportive living arrangement, or a complete inability to function independently outside the area of her home.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except she can occasionally climb ramps, stairs, ladders, ropes, and scaffolds; must avoid all exposure to workplace hazards such as unprotected heights and open moving machinery; is limited to simple tasks, simple instructions, and simple decisions; cannot perform consistent rapid or production rate pace work; can have occasional contact with coworkers, supervisors, and the public; and is limited to few changes in work processes and locations.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s)

14

that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work related activities.

The claimant testified that, through the date last insured, she experienced symptoms of ankle swelling, leg cramps, hot flashes, fatigue, back pain, and impaired focus and memory secondary to cancer treatment. She stated that she elevated her legs three times per week, napped for two hours per day, utilized a cane for ambulation secondary to unsteadiness on her feet, and required assistance from her husband for bathing during a period from 2016 until 2017. She also testified to radiation chest burns that affected her ability to reach with the left upper extremity. In addition to the impaired memory and focus, she alleged mental health symptoms of depressed mood, feeling guilty, being easily overwhelmed, and "bad" days once per month during which she isolated in her bedroom.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

In terms of the claimant's physical allegations, the evidence of record fails to support greater functional limitations than determined herein through the date last insured. A routine mammogram found suspicious calcifications that were suggestive of malignancy in November 2015 (Exhibit 1F). Supplemental diagnostic studies confirmed left breast invasive ductal carcinoma with four positive lymph nodes and negative margins in December 2015 (Id.). The claimant underwent left breast mastectomy in January 2016 (Exhibit 3F). Follow-up imaging studies are negative for metastatic disease in the chest, abdomen, and pelvis (Id.). Postoperative treatment records document no subjective complaints and examinations are entirely normal and found a healed mastectomy by February 2016 (Id. and 5F). The claimant underwent port placement and began chemotherapy in February 2016 (Id.). She reported some initial nausea but

denied other symptoms and endorsed feeling well with normal activity levels following her first chemotherapy cycle in March 2016 (Id.). The claimant also reported that the nausea was relieved with Zofran following the second chemotherapy round and denied adverse side effects in April 2016 (Id.). While the claimant reported intermittent weakness and feeling tired, she denied excessive malaise and fatigue following the 3rd chemotherapy cycle in April 2016 (Id.). She completed her fourth round of chemotherapy and endorsed only fatigue and generalized body aches for one to two days that was relieved with Aleve in May 2016 (Id.). She also reported that she currently feels well with stable energy levels and appetite (Id.). The claimant subsequently began weekly Taxol therapy, endorsed only minor myalgia that is relieved by Advil, and was found to be tolerating said treatment very well without any difficulties in May 2016 (Id.). In June 2016, the claimant reported only mild nausea and fatigue during the day of treatment but stated that she remains very active and painted her living room (Id.). She was assessed as doing very well without significant side effects (Id.). She completed the Taxol therapy, which was tolerated without any problems in August 2016 (Id.).

The claimant began radiation therapy, denied side effects, and reported that she is doing very well with normal energy levels in September 2016 (Id.). A preoperative evaluation reports no subjective complaints in November 2016 (Exhibit 1F). Secondary to a positive BRCA2 gene, the claimant underwent elective hysterectomy and bilateral salpingo-oophorectomy in November 2016 (Id.). She reported only feeling kind of tired and fatigued with recent foot swelling but indicated that these symptoms are not significant, and she is doing well overall during a December 2016 follow-up examination (Exhibit 5F). While workup revealed no right breast cancer, the claimant elected to undergo right mastectomy due to the potential risks that are associated with the BRCA2 gene in February 2017 (Exhibit 3F). In February 2017, she reported only some discomfort in her ankles since returning to work and being on her feet all day but also indicated that she is doing well overall (Exhibit 5F). The claimant was utilizing Fosamax and denied adverse side effects at that time (Id.). The claimant endorsed the onset of hot flashes and denied other symptoms in August 2017 (Id.). Upon follow-up, the claimant reported that the hot flashes are not as prominent with the use of Effexor in December 2017 (Id.). While she also reported some myalgias, this is attributed to a lot of lifting and working with hands and arms as a bartender in December 2017 (Exhibit 2F). The claimant next reported that that hot flashes are manageable in April 2016 and only minor in severity in August 2018 (Exhibit 5F). She also reported that she is doing well overall through December 2018 (Id.). In February 2019, the claimant reported that her feet only slightly swell after bartending on her feet for eleven hours at a time (Exhibit 2F). Most recently, she reported that she is doing great and regularly walking for exercise in June 2019, and endorsed good energy levels and appetite without adverse hormonal therapy side effects in December 2019 (Exhibit 5F). Longitudinally, oncology describes the claimant as doing well relative to the cancer and treatment, and there is no evidence of recurrence or metastases from

February 2016 through December 2019 (Id.). The claimant also denied respiratory, cardiovascular, gastrointestinal, and neurological symptoms, including numbness, tingling, and burning, and oncology and primary care examinations are wholly unremarkable, as they describe no edema and normal respiratory, cardiovascular, gastrointestinal, genitourinary, musculoskeletal, and neurological functioning to include gait, strength, sensations, reflexes, and range of motion during this period (Id. and 2F). There is no evidence of incoordination, imbalance, or unsteadiness, and no treating or examining medical source reports the use of an assistive device for ambulation during the period under consideration.

In considering the positive response to surgical intervention, diagnostic studies that are negative for cancer recurrence and metastases, denial of significant radiation, hormonal, bisphosphonate, and chemotherapy side effects, and unremarkable clinical findings, the evidence off record fails to support the severity of the claimant's symptoms through the date last insured. These factors are persuasive in finding that any reasonable limitation stemming from the cancer and subsequent treatment is more than adequately accommodated within a light residual functional capacity that involves occasional climbing and no exposure to workplace hazards.

In considering the claimant's obesity, the undersigned finds no indication that this condition, independently or in combination with co-existing impairments, compromised her capacity to perform a range of light work. The claimant's obesity did not affect her ability to use the upper extremities, get around on a regular basis, engage in daily activities, or perform work activity in the past. There also is no indication that the claimant's obesity has resulted in any other clinical manifestations, including edema of the lower extremities, chest pain, or shortness of breath. As discussed above, examinations show normal physical functioning during the period at issue. Accordingly, the undersigned finds that any reasonable limitation stemming from this condition is adequately accommodated within the parameters of the residual functional capacity.

From a mental health standpoint, the evidence of record again fails to establish greater functional limitations than determined herein. The record first reports mild anxiety secondary to the cancer diagnosis in February 2016 (Exhibit 5F). However, the claimant also reported that she is feeling well overall at that time (Id.). The claimant next endorsed crying spells secondary to depression for which Effexor was prescribed in August 2017 (Id.). She subsequently reported that the depression improved with said medication through April 2018 and follow-up oncology examinations are devoid of complaints related to the claimant's mental health through December 2019 (Id.). The claimant also reported that the medication and working daily has helped the depression considerably in February 2019 (Exhibit 2F). Longitudinally, oncology and primary care examinations describe a pleasant, cooperative, alert, and fully oriented presentation without

mental status abnormalities in mood, affect, appearance, speech, motor activity, eye contact, manner of relating, insight, judgment, reasoning, perception, attention, concentration, memory, cognitive functioning, or thought processes from the alleged onset date through December 2019 (Id. and 5F). The claimant did not require or pursue formal behavioral health treatment with a psychiatrist, psychologist, or counselor. As discussed above, her activities of daily living were intact from a mental health standpoint. In considering these factors most favorably towards her, the undersigned has restricted the claimant to occupations that involve simple tasks, simple instructions, simple decisions, occasional interaction with others, few workplace changes, and no rapid or production rate pace requirements thereby more than adequately accommodating any reasonable limitation stemming from her mental impairments.

As for medical opinion(s) and prior administrative medical finding(s), the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources.

The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

The undersigned is unpersuaded by the opinions of Dr. Hadeed and Ms. Lamary, an oncologist and physician assistant, respectively, because they are inconsistent with the oncology treatment records. Specifically, the opinions that the claimant would be absent from work more than two days per month, off task more than 15% of a workday due to impaired attention and concentration, and need to take extra breaks during the workday are inconsistent with the claimant's subjective reports that she is feeling well overall with normal activity and energy levels and no significant cancer treatment side effects, and Dr. Hadeed's assessments that found her to be doing well overall from February 2016 through December 2019. Additionally, physical and mental status examinations are wholly unremarkable and show an awake, alert, and fully oriented presentation without clinical deficits in attention or concentration during this period. Moreover, the medical source statement does not supply objective signs or findings in support of the opinions; Dr. Hadeed did not sign the medical source statement; and the medical record documents no treatment with Ms. Lamary prior to the date last insured. As such, Ms. Lamary's and Dr. Hadeed's August 2024 opinions are not an accurate representation of the claimant's level of functioning through June 2019, the date last insured.

The undersigned is also unpersuaded by the State agency medical consultants' opinions. While the longitudinal examinations, which found normal physical functioning to include gait, strength, sensations, reflexes, range of motion, and motor function, do not provide objective medical findings that would preclude medium exertion work, the undersigned finds that the few complaints of fatigue

and body aches would reasonably restrict the claimant to light exertion lifting and carrying.

The undersigned has also considered the June 2024 third-party statements from Ms. Kendrew and McIlroy, the claimant's former employers, and, to the extent that they are consistent with the medical record, accepted them. However, their statements do not establish that the claimant is disabled. They are not medical or vocational professional and, as a lay witnesses, they are not competent to make exacting observations as to the severity of the claimant's symptoms in relation to her ability to perform all work activity in the national economy. More importantly, the clinical and diagnostic medical evidence of record supports the conclusions herein. For example, examinations show no lower extremity edema, overt pain behaviors, acute distress, or deficits in grip strength or dexterity, which fails to support the statements that the claimant's feet swell with prolonged standing, she experiences chronic pain, and she drops objects due to poor grip. Thus, the undersigned does not find their statements to be particularly persuasive because they are not entirely consistent with the preponderance of evidence in this case, which directs a finding of not disabled through the date last insured.

In sum, the above residual functional capacity assessment is supported by the preponderance of medical and non-medical evidence of record, including the claimant's course of treatment, response to treatment, and activities of daily living. The claimant alleges limitations that would preclude the performance of substantial gainful activity on a full-time basis. However, her allegations are not entirely consistent with or supported by the medical and other evidence because a review of the entire record fails to reasonably support the nature, intensity, frequency, or duration of the limitations alleged by the claimant through the date last insured.

**6. The claimant has no past relevant work (20 CFR 404.1565).**

**7. The claimant was born on May 5, 1970 and was 49 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).**

**8. The claimant has at least a high school education (20 CFR 404.1564).**

**9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).**

ECF 4-2, p. 25-32.

## IV. ANALYSIS

### *A. Plaintiff's Challenge to the ALJ's RFC Determination*

Plaintiff contends that the ALJ failed to support her residual functional capacity ("RFC") determination with substantial evidence, by specifically failing "to properly evaluate the opinion[s] of Plaintiff's treating providers, Dr. Hadeed and PA Lamary."  The Court disagrees.

First, as noted above, the ALJ stated:

> "The undersigned is unpersuaded by the opinions of Dr. Hadeed and Ms. Lamary, an oncologist and physician assistant, respectively, because they are inconsistent with the oncology treatment records. Specifically, the opinions that the claimant would be absent from work more than two days per month, off task more than 15% of a workday due to impaired attention and concentration, and need to take extra breaks during the workday are inconsistent with the claimant's subjective reports that she is feeling well overall with normal activity and energy levels and no significant cancer treatment side effects, and Dr. Hadeed's assessments that found her to be doing well overall from February 2016 through December 2019. Additionally, physical and mental status examinations are wholly unremarkable and show an awake, alert, and fully oriented presentation without clinical deficits in attention or concentration during this period. Moreover, the medical source statement does not supply objective signs or findings in support of the opinions; Dr. Hadeed did not sign the medical source statement; and the medical record documents no treatment with Ms. Lamary prior to the date last insured. As such, Ms. Lamary's and Dr. Hadeed's August 2024 opinions are not an accurate representation of the claimant's level of functioning through June 2019, the date last insured.

ECF 4-2, p. 31.

The ALJ, in addressing the opinions of Plaintiffs treating providers found that their opinions did not match the objective findings found in Plaintiff's treatment records. The ALJ pointed to specifics where the opinions of the medical experts concerning Plaintiff's alleged impaired attention and concentration, and her alleged need to take extra breaks were wholly inconsistent with the subjective reports delivered by Plaintiff herself an captured in the medical record. Plaintiff reported feeling "well overall" and claimed to have "normal" energy and activity

levels with no significant cancer side effects.  The ALJ had previously noted that some of the side effects that Plaintiff did encounter, such as nausea, minor myalgia, and hot flashes and were managed with medications, and at least one of which was nonprescription Advil. Plaintiff's providers found her mental status be "wholly unremarkable and show an awake, alert, and fully oriented" individual "without clinical deficits in attention or concentration[,]" thus providing additional evidence in support of the ALJ's determination related to the RFC.

Next, the ALJ also considered the state agency's medical consultants but discounted those opinions as well. The opinions of the state agency's medical consultants concluded that Plaintiff could perform medium duty work.  The ALJ found that these opinions were also not supported by the Plaintiff's medical record as a whole, specifically noting that Plaintiff possessed some restrictive work abilities and thus, was able to perform light work, but not the medium level that the state agency providers recommended.

Finally, the ALJ did consider and properly discounted the lay opinions of Plaintiff's former employers.  As noted by the ALJ:

> "Ms. Kendrew and McIlroy, the claimant's former employers . . .  do not establish that the claimant is disabled. They are not medical or vocational professional and, as a lay witnesses, they are not competent to make exacting observations as to the severity of the claimant's symptoms in relation to her ability to perform all work activity in the national economy. More importantly, the clinical and diagnostic medical evidence of record supports the conclusions herein. For example, examinations show no lower extremity edema, overt pain behaviors, acute distress, or deficits in grip strength or dexterity, which fails to support the statements that the claimant's feet swell with prolonged standing, she experiences chronic pain, and she drops objects due to poor grip. Thus, the undersigned does not find their statements to be particularly persuasive because they are not entirely consistent with the preponderance of evidence in this case, which directs a finding of not disabled through the date last insured.

ECF 4-2, p.31.

21

Based on the Court's review of the evidence in this case, the Court finds that the ALJ's RFC determination was based on substantial evidence of record and therefore, the Court will deny the Plaintiff's motion in this regard.

### B. Plaintiff's Challenge to ALJ's evaluation of Plaintiff's subjective complaints

Plaintiff, noting that the ALJ had to complete a two-step process to evaluate her subjective complaints, has also argued that the ALJ did not do so. Again, the Court disagrees with Plaintiff.

The ALJ stated:

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical or laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work related activities.

The claimant testified that, through the date last insured, she experienced symptoms of ankle swelling, leg cramps, hot flashes, fatigue, back pain, and impaired focus and memory secondary to cancer treatment. She stated that she elevated her legs three times per week, napped for two hours per day, utilized a cane for ambulation secondary to unsteadiness on her feet, and required assistance from her husband for bathing during a period from 2016 until 2017. She also testified to radiation chest burns that affected her ability to reach with the left upper extremity. In addition to the impaired memory and focus, she alleged mental health symptoms of depressed mood, feeling guilty, being easily overwhelmed, and "bad" days once per month during which she isolated in her bedroom.

22

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

ECF 4-1, p. 28.

Immediately following these statements, the ALJ carefully laid out all of Plaintiff's cancer treatments quoting from the medical records extensively in an effort to demonstrate the incongruent nature of Plaintiff's physical condition as captured by her medical providers at the time she underwent treatment and her own claims of disability. The Court also notes that Plaintiff's subjective complaints, alone, can never establish liability and the ALJ would have had to at least reference objective clinical signs and lab results which would have supported Plaintiff's subjective complaints. 20 C.F.R. 404.1529(b) and (c)(1)-(3). Because no such findings in the medical record as a whole support Plaintiff's complaints and because the ALJ's determination demonstrates (as quoted above) that she did in fact consider Plaintiff's complaints, the Court will deny the Plaintiff's motion in this regard also.

24

**V. CONCLUSION**

AND NOW this, 15th day of May, 2026, based on the foregoing law and authority, the

Court DENIES Plaintiff's motion for summary judgment (ECF 11).

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc:    All Registered ECF Counsel and Parties